FILED
2021 Jan-07 PM 04:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **BRADLEY EGENBERG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Case No: _____ |
| | ) | |
| **MAINSAIL DIGITAL, LLC;** | ) | |
| **DOUGLAS MOORE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

COMES NOW plaintiff Bradley Egenberg and hereby alleges as follows:

### BACKGROUND AND PARTIES

1.     Plaintiff Bradley Egenberg ("**Egenberg**") is an individual resident of the State of Louisiana.

2.     Non-party Alliance Injury Group, LLC ("**AIG**") is a limited liability company formed under the laws of the State of Alabama.

3.     Non-party Legal Management Solutions, LLC ("**LMS**") is a limited liability company formed under the laws of the State of Alabama.

4.     Defendant Mainsail Digital, LLC ("**Mainsail**") is a limited liability company formed under the laws of the State of Wyoming.

1

5.      Mainsail may be served via its registered agent, Registered Agents Inc., at 30 N. Gould Street, Suite R, Sheridan, Wyoming 82801.

6.      Defendant Douglas Moore ("**Moore**") is an individual resident of the State of Alabama.

7.      Moore may be served at 5343 Highway 16, Montevallo, Alabama 35115.

8.      Egenberg and Mainsail are the members of AIG.

9.      The ownership interest of Egenberg and Mainsail in AIG are as follows: Egenberg (25%) and Mainsail (75%).

10.     Egenberg and Mainsail are the members of LMS.

11.     The ownership interest of Egenberg and Mainsail in LMS are as follows: Egenberg (25%) and Mainsail (75%).

12.     Upon information and belief, the members of Mainsail are Moore and non-party Terry Olson ("**Olson**").

13.     Egenberg holds a minority and non-controlling interest (25%) in both AIG and LMS.

14.     Both AIG and LMS remain in existence today.

15.     Neither Mainsail nor Egenberg transferred its/his membership interest in AIG or LMS.

16.     AIG is operated and managed by its manager, Mainsail.

17.     LMS is operated and managed by its manager, Mainsail.

18.     Upon information and belief, Mainsail is operated and managed by its manager, Moore.

19.     Through Mainsail, Moore exercises managerial control over AIG

20.     Through Mainsail, Moore exercises managerial control over LMS.

21.     Egenberg asserts all claims herein directly, on his own behalf, pursuant to the provisions of *Ala. Code* § 10A-5A-9.01 which allows the member of a limited liability company to bring claims directly against other members if all members are named as parties.

22.     Because Mainsail and Moore exercise managerial control of AIG, each owes fiduciary duties to AIG and Egenberg, including a duty of loyalty, duty of care, and the implied covenant of good faith and fair dealing. *Ala. Code* § 10A-5A-4.08.

23.     Because Mainsail and Moore exercise managerial control of LMS, each owes fiduciary duties to LMS and Egenberg, including a duty of loyalty, duty of care, and the implied covenant of good faith and fair dealing. *Ala. Code* § 10A-5A-4.08.

24.     Because Mainsail and Moore exercise managerial control of AIG and LMS, each owes Egenberg the duty to disclose the books and records of AIG and LMS to Egenberg upon proper request. *Ala. Code* § 10A-5A-4.09.

## JURISDICTION AND VENUE

25.     This Court's jurisdiction in this matter arises from 28 U.S.C. § 1332.

26.     Egenberg is a citizen of Louisiana.

27.     Moore is a citizen of Alabama.

28.     Olson is a citizen of Texas.

29.     Because the members of Mainsail are citizens of the States of Alabama (Moore) and Texas (Olson), for jurisdictional purposes, Mainsail is also a citizen of Alabama and Texas.

30.     Accordingly, there is complete diversity between the plaintiff (LA) and the defendants (AL & TX).

31.     This dispute involves various torts, breaches of contract and other violations of fiduciary obligations which involve a value greater than $75,000.

32.     Mainsail operates in Jefferson County, Alabama.

33.     Upon information and belief, Moore resides in Jefferson or Shelby County within the Southern Division of the Northern District of Alabama.

34.    Based on these facts and allegations, the federal courts may exercise diversity jurisdiction over this dispute.

35.    Based on these facts and allegations, venue is proper in the Southern Division of the United States District Court for the Northern District of Alabama.

## FACTS

36.    Egenberg is a practicing attorney in New Orleans, Louisiana.

37.    Egenberg invested in various legal marketing companies operated by Mainsail, including AIG, LMS, and non-party The Law Center, LLC ("**TLC**").

38.    AIG specializes in purchasing Google Adwords for digital advertisements for personal injury attorneys.

39.    LMS operates as a call center for personal injury case referrals.

40.    TLC specializes in ranking law firms organically in Google searches using search engine optimization techniques.

41.    Egenberg invested $320,000 for a 25% membership interest in AIG which later "spun off" LMS with the same ownership structure.

42.    AIG and LMS later "spun off" TLC in which Egenberg also held a 25% membership interest.

43.    Egenberg was both an owner and a client of AIG, LMS, and TLC.

44.    As a client of AIG, LMS, and TLC, Egenberg and his firm paid thousands of dollars per month to AIG, LMS, and TLC for the advertising services.

45.    Egenberg did not take an active role in the management of AIG, LMS, or TLC but instead left the management of the companies to Mainsail and Moore while Egenberg managed his law practice in New Orleans.

46.    In August 2020, Egenberg discovered that TLC was not receiving advertising rebates typically provided by certain advertising vendors engaged by TLC.

47.    In the case of TLC, TLC contracts with a client (a lawyer or law firm) to participate as a Law Center representative in a particular city or region. In certain instances, TLC may engage a different company to purchase the advertising promised to the client or to assist with other search engine optimization tasks.

48.    As a part of this process, the vendor provides a "rebate" on for the contracted amount of advertising or other services purchased through the vendor.

49.    This rebate is typically 15% of the total amount of advertising purchased.

50.    TLC did not receive any rebates from its vendors. Instead, at Moore's direction, those rebates from TLC's vendors were diverted to Moore's company, BDL Services, LLC.

51.     Egenberg is not a member of BDL Services, LLC.

52.     Olson is not a member of BDL Services, LLC.

53.     Assuming TLC paid for the vendor services (this is not clear as noted below), the rebates belonged to TLC. If any amounts from the rebates were to be distributed, those funds should have been distributed to TLC's members in accordance with each member's membership interest in TLC.

54.     Upon information and belief, the purchases by TLC from certain vendors resulted in a total rebates due to TLC in excess of $100,000. TLC did not receive those rebates.

55.     On September 11, 2020, Egenberg requested certain financial information from TLC pursuant to *Alabama Code* § 10A-5A-4.09, including documentation of TLC's dealings with particular vendors that provided such rebates.

56.     Mainsail and Moore, as the persons exercising managerial authority over TLC, provided only a simple ledger of transactions unsupported by any backup documentation, such as bank accounts, contracts, invoices, cancelled checks, etc.

57.     Before Mainsail and Moore fully provided the requested information, the parties reached an agreement for the repurchase of Egenberg's membership interest in TLC.

58.     During the dispute regarding TLC, Egenberg refused to make payments to AIG or LMS based on the suspicious financial activity in TLC.

59.     Instead, before any further payments would be made, Egenberg requested financial documentation from AIG and LMS to confirm the companies' proper use of their funds.

60.     Mainsail and Moore provided to Egenberg only perfunctory financial statements for AIG and LMS on October 20, 2020 along with a demand that Egenberg pay the amounts he previously refused to pay to AIG and LMS.

61.     In response, Egenberg provided to Mainsail and Moore a demand on October 21, 2020 for a list of specific documents. These specific documents were needed to provide an accurate picture of the financial situation of AIG and LMS. The requested documents included electronic Quickbooks files which would permit Egenberg to understand the cash flowing into AIG and LMS as well as the cash going out.

62.     In response to this demand, on November 2, 2020, AIG and LMS issued unlawful and improper capital calls demanding significant additional capital contributions from Egenberg.

63.     AIG made a $100,000 capital call, including the demand for payment from Egenberg of $25,000 of the $100,000 capital call.

64.     LMS made a $100,000 capital call, but demanded that Egenberg, the 25% minority owner of LMS, pay the entire $100,000 capital call.

65.     LMS failed to make the necessary corresponding capital call to Mainsail (the 75% owner) for $300,000.

66.     The AIG and LMS capital calls, without reference to any applicable provision of those entities' Operating Agreements or to the Alabama Limited Liability Company Law, further threatened to "dilute" Egenberg's interest in the entities if he refused to make the payment demanded.

67.     These demands were intended to intimidate Egenberg into giving up his demands for financial information from AIG and LMS or selling his membership interests in AIG and LMS to Mainsail or Moore at deflated prices.

68.     Counsel for Egenberg immediately asked for the written approval or meeting minutes approving the AIG and LMS capital calls, as Egenberg was not given any notice whatsoever of a meeting by either entity or Mainsail.

69.     Egenberg also requested that AIG and LMS articulate the purpose of the capital call and proof of payment by the majority member (Mainsail) of its portion of any capital call.

70.     On November 3, 2020, counsel for AIG and LMS responded via e-mail to Egenberg's September 11, 2020 demand for information.

71.    In the November 3, 2020 e-mail, AIG and LMS took the improper and incorrect position that Egenberg was not entitled to receive the original Quickbooks data for AIG and LMS.

72.    Egenberg requested the original Quickbooks files because those files are the best means to allow Egenberg, or his accountants, to search the various transactions and determine when edits and other changes were made to the financial information.

73.    Then, on November 4, 2020, AIG and LMS provided to Egenberg backdated written consents purporting to approve the capital calls. The November 4, 2020 letter from counsel for AIG and LMS was not-at-all informative and stated only the obvious—that the capital calls were needed because "[b]oth companies are experiencing a shortfall in operating capital."

74.    On November 6, 2020, Egenberg notified LMS and Mainsail that its Operating Agreement and the Alabama Limited Liability Company Law did not authorize the purported capital call because the capital call was an attempt to make a unilateral capital demand upon a minority member without a corresponding demand for the majority member's proportionate share of the capital call.

75.    Egenberg further informed AIG and LMS that their Operating Agreements specifically forbids the dilution of any member without unanimous

consent. Egenberg provided in the letter his disapproval of any such request to dilute his interest.

76.     Egenberg further refused to provide his portion of the AIG capital call because he was never provided with sufficient information from AIG to confirm the use of AIG's existing cash or whether there was any *bona fide* need for the capital call.

77.     In the November 6, 2020 letter from Egenberg's counsel, Egenberg also reiterated the need for the requested financial information from AIG and LMS.

78.     Egenberg paid into his counsel's trust account the full amount of the $25,000 capital call requested for AIG and notified counsel for AIG that the capital call could be released upon the happening of the following: "(1) production of the requested financial/corporate materials for AIG and LMS; (2) written confirmation and documentation of the corresponding $75,000 contribution from Mainsail; and (3) a satisfactory written description from AIG of the intended use of the $100,000 capital call (simply stating "operating costs" is not sufficient)."

79.     Egenberg received confirmation of the corresponding capital call payment by Mainsail, but, to this day, has received neither  the complete production of financial information nor a reasonable explanation as to the need or use of the funds requested.

80.    Later, AIG and LMS agreed to produce financial records.  However, rather than produce those materials in workable electronic format as requested by Egenberg's counsel in the November 6, 2020 letter, AIG and LMS elected to trouble itself to achieve the most inconvenient format possible—that is, LMS and AIG printed and then scanned those materials so Egenberg would effectively be unable to search the documents.

81.    AIG and LMS's counsel then invoiced Egenberg $487.50 in copying costs, a wholly unnecessary expense had AIG and LMS provided the materials electronically, as requested and as is customary in 21st century business practices anywhere.

82.    Even the $500 worth of copies was woefully inadequate. The production lacked the electronic Quickbooks files requested, did not include any "ledger" of activity, and failed to identify multiple bank accounts which received transfers of cash from the AIG and LMS account statements provided.

83.    After following up yet again with AIG and LMS regarding the incomplete production, AIG and LMS produced PDF copies of ledgers for AIG and LMS. Again, these materials were scans of printed out documents and, therefore, unable to be meaningfully searched.

84.     Moore—through counsel— promised production of the Quickbooks on December 10, 2020.  To date, this has yet to be tendered.

85.     Sharing and copying electronic Quickbooks files could be accomplished in a matter of minutes. Instead, over 60 days have now passed since the original requests were made to AIG and LMS with no production.

86.     However, despite the failure to provide the financial records requested, the partial production from AIG and LMS appears to show that Mainsail received $30,000 per month from either (or both) AIG and LMS for "consulting" services.

87.     Mainsail is the majority owner of AIG and LMS and their manager.

88.     Any services provided by Mainsail to AIG and LMS should not be "consulting" services but should be Mainsail's uncompensated managerial services.

89.     It also does not appear these payments were needed to pay employees or agents of AIG or LMS. The provided ledgers disclose other monthly payments to various payees which relate to labor or services needed for the operation of AIG and LMS. The ledgers further show purchases of any relevant advertising made via credit card.

90.     Instead, the payments are likely disguised distributions being paid to Mainsail as the majority member of AIG and LMS while similar distributions were not paid to the minority member, Egenberg.

91.    The incomplete production further failed to provide credit card statements for the credit cards used by AIG and LMS for vendor purchases, such as advertising.

92.    Although not clear from the financial records, and potentially further muddying the financial waters, it appears AIG may have purchased advertising for TLC using credit cards reimbursed by AIG.

93.    Further, those credit cards likely include "rewards" programs (such as "cash back rewards") which are the property of AIG or LMS. There is no indication in the incomplete production regarding the recipient of those credit card rewards.

94.    Between the disguised distributions and lack of accounting for the advertising discounts, it appears Mainsail and Moore may have improperly diverted from AIG and LMS between $30,000-$40,000 per month.

95.    Both AIG and LMS's operating agreements provide for the shifting of fees to the successful party in any litigation regarding AIG and LMS.

## CAUSES OF ACTION

### Count 1 – Failure to Produce Books and Records (Ala. Code § 10A-5A-4.09)

96.    Egenberg adopts and incorporates the previously alleged facts as if fully set forth herein.

97.    Mainsail and Moore have authority to bind AIG and LMS.

98.     Mainsail and Moore direct and oversee the activities and affairs of AIG and LMS.

99.     Egenberg made multiple requests to inspect or copy the complete "books and records" of AIG and LMS, specifically including the electronic Quickbooks files.

100.    The Quickbooks files are needed because those files allow the recipient to perform searches for certain transactions, amounts, accounts, etc., and permit the recipient to determine if, and possibly more importantly, when, any edits to the financial information were made.

101.    In other words, the Quickbooks files allow the user to make a much more accurate determination if there were any financial improprieties or if there was any effort to cover up any financial improprieties.

102.    As disclosed to AIG and LMS, Egenberg needed this information to determine if there was any impropriety in the finances of AIG and LMS like the improprieties Egenberg discovered with TLC.

103.    Egenberg further needed the information to be able to participate meaningfully in discussions with Moore and Mainsail about the sale or purchase of the parties' membership interests.

104.   Egenberg's stated purpose for inspecting the records was a "proper purpose."

105.   Alabama Code § 10A-5A-4.09(b) provides that, "on 10 days' notice made in a writing received by the limited liability company, the records set forth in subsection (a) above, and any other books and records of the limited liability company, wherever situated, are subject to inspection and copying for any proper purpose by any member or the member's agent or attorney during regular business hours."

106.   Subsection (a) of § 10A-5A-4.09 requires a limited liability company to maintain "(1) A current list of the full name and last known business or residence street address of each member. (2) A copy of the filed certificate of formation and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any documents have been executed. (3) Copies of the limited liability company's federal, state, and local income tax returns and reports, if any, for the three most recent years. (4) Copies of the then effective limited liability company agreement including any amendments thereto. [and] (5) Copies of any financial statements of the limited liability company for the three most recent years."

107.   The language of § 10A-5A-4.09(b) is very broad. In addition to the right to inspect the records set forth in -4.09(a), the statute allows a member to inspect or

copy "any other books and records of the limited liability company, wherever situated."

108.   The language of § 10A-5A-4.09(b) permits a member to inspect or copy original Quickbooks files.

109.   Throughout these demands to inspect the records, Egenberg even repeatedly offered to accept the Quickbooks files in a "protected" fashion that would not permit Egenberg or his accounting experts to alter any of the data but would still provide Egenberg with the ability to search the information and determine when edits were made.

110.   Section -4.09(b) further provides that "any person with the authority to bind the limited liability company under Section 10A-5A-3.02 and any person with the authority to direct and oversee the activities and affairs of a limited liability company who, without reasonable cause, refuses to allow any member or the member's agent or attorney to inspect or copy any books or records of the limited liability company for any proper purpose shall be personally liable to the member for a penalty in an amount not to exceed 10 percent of the fair market value of the transferable interest of the member, in addition to any other damages or remedy."

111.   Moore and Mainsail refused to allow Egenberg to inspect or copy the requested records of AIG and LMS.

112.   Moore and Mainsail refused to allow Egenberg to inspect or copy the requested records of AIG and LMS without reasonable cause.

113.   Moore and Mainsail are personally liable to Egenberg for the statutory penalty of up to 10% of the fair market value of AIG and LMS, in addition to any other damages or remedy such as the payment of Egenberg's attorney fees incurred in seeking compliance with the inspection statute.

WHEREFORE, based on the foregoing, Egenberg demands judgment in his favor and against Moore and Mainsail based upon the failure of Moore and Mainsail to permit inspection and copying of the books and records of AIG and LMS in the amount of 10% of the fair market value of AIG and LMS, plus pre-judgment interest and costs, including attorney fees.

### *Count 2 – Breach of Fiduciary Duty*

114.   Egenberg adopts and incorporates the previously alleged facts as if fully set forth herein.

115.   Egenberg and Mainsail are the members of AIG and LMS.

116.   Mainsail is the manager of AIG and LMS.

117.   Moore is a member and, upon information and belief, the manager of Mainsail.

118.   Moore has the authority to direct and oversee the activities and affairs of Mainsail.

119.   Moore exercises his authority to direct and oversee the activities and affairs of Mainsail.

120.   Mainsail and Moore have the authority to direct and oversee the activities and affairs of AIG.

121.   Mainsail and Moore exercise their authority to direct and oversee the activities and affairs of AIG.

122.   Mainsail and Moore have the authority to direct and oversee the activities and affairs of LMS.

123.   Mainsail and Moore exercise their authority to direct and oversee the activities and affairs of LMS.

124.   As persons exercising operational control and management of the activities and affairs of AIG and LMS, Mainsail and Moore owe fiduciary duties to AIG, LMS, and to Egenberg, as the minority member of AIG and LMS.

125.   Mainsail and Moore intentionally, wantonly, or negligently breached their fiduciary duty to Egenberg by diverting business and opportunities of AIG and LMS for their own personal benefit.

126.   Egenberg was damaged by the breach of fiduciary duty by Mainsail and Moore.

WHEREFORE, based on the foregoing, Egenberg demands judgment in his favor and against Mainsail and Moore sufficient to make Egenberg whole for the damage incurred because of the wrongful actions of Mainsail and Moore, including punitive damages, plus pre-judgment interest and costs, including attorney fees.

### *Count 3 – Breach of Contract*

127.   Egenberg adopts and incorporates the previously alleged facts as if fully set forth herein.

128.   Mainsail and Egenberg are members of AIG and LMS.

129.   AIG and LMS both have Operating Agreements which govern their management and operation.

130.   The AIG and LMS Operating Agreements are contractual agreements between the members of AIG and LMS.

131.   Egenberg abided by his contractual obligations set forth in the AIG and LMS Operating Agreements.

132.   Mainsail breached the terms of the Operating Agreements in various ways, including without limitation the failure to provide Egenberg requested

financial information regarding AIG and LMS and the attempt to improperly dilute Egenberg's membership interest in AIG and LMS.

133.   Egenberg was damaged by Mainsail's breach of the Operating Agreements.

WHEREFORE, based on the foregoing, Egenberg demands judgment in his favor and against Mainsail sufficient to make Egenberg whole for the damage incurred because of the wrongful actions of Mainsail, plus pre-judgment interest and costs, including attorney fees.

### *Count 4 – Breach of Duty of Loyalty*

134.   Egenberg adopts and incorporates the previously alleged facts as if fully set forth herein.

135.   Mainsail and Moore exercise managerial control over AIG and LMS.

136.   At all materials times relevant to the actions alleged herein, Mainsail and Moore were exercising such managerial control.

137.   Accordingly, pursuant to *Ala. Code* § 10A-5A-4.08, Mainsail and Moore owe a duty of loyalty to: (1) account to AIG and LMS and to hold as trustee for AIG and LMS any property, profit, or benefit derived by Mainsail and Moore in the conduct of AIG and LMS's business activities and affairs or derived from a use by Mainsail and Moore of AIG and LMS's property, including the appropriation of

the limited liability company's opportunity; (2) refrain from dealing with AIG or LMS in the conduct of AIG or LMS's activities and affairs as or on behalf of a party having an interest adverse to the limited liability company; and (3) refrain from competing with AIG or LMS in the conduct of AIG or LMS's activities and affairs before the dissolution of the limited liability company.

138.   By taking the actions described herein, including directing payments due to AIG and LMS to Mainsail and Moore, the defendants violated their duty of loyalty to AIG, LMS, and Egenberg to hold in trust for AIG and LMS all property, profits and benefits derived by Mainsail and Moore from the business of AIG and LMS.

139.   Egenberg will be, and has been, monetarily damaged by the actions of Mainsail and Moore.

WHEREFORE, based on the foregoing, Egenberg demands judgment in his favor and against Mainsail and Moore sufficient to make Egenberg whole for the damage incurred because of the wrongful actions of Mainsail and Moore, including punitive damages, plus pre-judgment interest and costs, including attorney fees.

### Count 5 – Breach of Duty of Care

140.   Egenberg adopts and incorporates the previously alleged facts as if fully set forth herein.

141.   Mainsail and Moore exercise managerial control over AIG and LMS.

142.   At all materials times relevant to the actions alleged herein, Mainsail and Moore were exercising such managerial control.

143.   The duty of care of owed by Mainsail and Moore to AIG, LMS, and Egenberg in the conduct of AIG and LMS's activities and affairs includes refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

144.   By taking the actions described herein, including directing payments due to AIG and LMS to Mainsail and Moore, Mainsail and Moore violated the duty of care to AIG, LMS, and Egenberg by engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

145.   Egenberg will be, and have been, monetarily damaged by the actions of Mainsail, AIG, and LMS.

WHEREFORE, based on the foregoing, Egenberg demands judgment in his favor and against Mainsail and Moore sufficient to make Egenberg whole for the damage incurred because of the wrongful actions of Mainsail and Moore, including punitive damages, plus pre-judgment interest and costs, including attorney fees.

### *Count 6 – Squeeze-Out/Minority Member Oppression*

146.   Egenberg adopts and incorporates the previously alleged facts as if fully set forth herein.

147.   Egenberg is a minority member of AIG and LMS.

148.   Even though Egenberg remains a member of AIG and LMS, Mainsail and Moore refused to make regular distributions to Egenberg despite making regular (disguised) distributions to Mainsail.

149.   Any distributions paid to Egenberg were sporadic and not in line with the regular distributions made to Mainsail.

150.   Mainsail and Moore, in retaliation for Egenberg's lawful and proper request for information from AIG and LMS, then purported to dilute Egenberg's membership interest in AIG and LMS through an improper and unlawful capital call.

151.   These actions taken by Mainsail and Moore are intended to squeeze-out or oppress Egenberg, thereby either allowing Mainsail and Moore to redistribute Egenberg's membership interests to Mainsail or causing Egenberg to have no option but to sell back his membership interest to Mainsail at a deflated value.

152.   Egenberg was damaged by the wrongful oppression and squeeze-out undertaken by Mainsail and Moore.

WHEREFORE, based on the foregoing, Egenberg demands judgment in his favor and against Mainsail and Moore sufficient to make Egenberg whole for the damage incurred because of the wrongful actions of Mainsail and Moore, including punitive damages, plus pre-judgment interest and costs, including attorney fees.

### *Count 7 – Unjust Enrichment*

153.   Egenberg adopts and incorporates the previously alleged facts as if fully set forth herein

154.   Egenberg and Mainsail entered into Operating Agreements governing the management and operation of AIG and LMS.

155.   In violation of those Operating Agreements, Mainsail and Moore diverted revenue, distributions, and assets of AIG and LMS for their own personal benefit.

156.   Egenberg did not receive the benefit of the work and revenue performed by AIG and LMS.

157.   If Mainsail and Moore are permitted to take this action, they would receive undue benefits from their actions, including receiving benefits due to Egenberg as a member of AIG and LMS.

158.   Mainsail and Moore should not be permitted to prosper or be unjustly enriched based upon their wrongful actions.

WHEREFORE, based on the foregoing, Egenberg demands judgment in his favor and against Mainsail and Moore sufficient to make Egenberg whole for the damage incurred because of the wrongful actions of Mainsail and Moore, plus pre-judgment interest and costs, including attorney fees.

Egenberg requests such other or different relief as may be necessary, required, or available.

Respectfully submitted,

_/s/ John W. Clark IV_
JOHN W. CLARK IV (CLA087)

CLARK LAW FIRM PC
The Landmark Center, Suite 600
2100 First Avenue North
Birmingham, Alabama 35203
Telephone:  205.506.0075
Facsimile:  205.506.0624
Email:       jclark@clarklawfirm.com

**Attorneys for plaintiff Bradley Egenberg**

**\*\*\*Please serve the defendants
via certified mail at the following
addresses:**

**Doug Moore**                          **Mainsail Digital, LLC**
**5343 Highway 16**                      **c/o Registered Agents Inc.**
**Montevallo, Alabama 35115**            **30 N. Gould Street, Suite R**
                                         **Sheridan, Wyoming 82801**